CLERK US DISTRICT COURT
NORTHERN DIST. OF TX.
FILED

2017 AUG -3 PM 3: 18

DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| PATRICK H. WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 1:15-CV-116-BL |
| CHARLES SAMUELS, Jr., *et al.,* | ) | |
| | ) | |
| Defendants. | ) | Assigned to U.S. Magistrate Judge |

## REPORT AND RECOMMENDATION

This case was reassigned to the United States Magistrate Judge under Second Amended

Special Order No. 3-301. Although Plaintiff was informed of the right to consent to the disposition

of this case by a magistrate judge under 28 U.S.C. § 636(c), he has chosen to not consent, and

therefore the undersigned magistrate judge enters this report and recommendation under the authority

of 28 U.S.C. 636(b). Based on the relevant filings and applicable law, all claims stated in the

amended complaint, as supplemented by the more definite statement, should be **DISMISSED** with

prejudice, except any claims for lack of medical/dental care while he was housed in the Special

Housing Unit (SHU), which should be **DISMISSED** without prejudice. After entry of this report

and recommendation, the case should be reassigned to Senior United States District Judge Sam R.

Cummings.

### I. BACKGROUND/FACTS

Plaintiff Patrick H. Watson, acting *pro se,* filed a form civil complaint. (Doc. 1.) Before the

Court had reviewed the case, Plaintiff filed a typed amended complaint.[1] (Doc. 5) In the amended

---

[1]As Plaintiff was previously informed in the Order for More Definite Statement, the Court will
review only the amended complaint, along with his more definite statement filed in compliance with that
order. *See generally Clark v. Tarrant County,* 798 F.2d 736, 740 (5th Cir. 1986) (holding an amended

complaint, Watson named as defendants Charles Samuels, Jr., Director, Bureau of Prisons; Howard County College; and several officials at FCI-Big Spring: Warden Batts, Associate Warden Williams, an unnamed Captain, Lieutenant Miller, Lieutenant Breuer, Lieutenant Monica Anderson, Officer Kennedy, an unnamed Facilities Manager, and unnamed Recreation Shack Officers, and other unnamed officers. Amend. Compl. (Doc. 5, at 4-5; 15.) In response to the Court's order for a him to answer specific questions about the allegations in the complaint, Plaintiff filed a more definite statement (MDS). (Doc. 23.)

In the amended complaint, Plaintiff, who is African-American, alleges that while he was housed at FCI-Big Spring in the early morning hours of August 7, 2013, after he had gone to a recreation yard work-out area known to the inmates as "the cage", a large number of Hispanic (200-300) inmates came charging up the hill from a lower recreation yard, and began attacking African-American inmates with lose bricks as weapons. (Doc. 5, at 11-12.) Although several African-American inmates tried to get inside the cage area, Watson says his only option was to run towards the gymnasium, at which time he was hit in the neck, face and below the nose with "flying" bricks, and immediately went down. *Id.* at 12. Plaintiff reports that he was helped up off the floor and given a shirt with ice wrapped in it, and then discovered that he had a tooth and root knocked out of his mouth. *Id.* Watson reports that it was twenty minutes later before he was removed from the area, at which time he was handcuffed and escorted to a medical area across form the gymnasium. Watson was initially seen by a nurse assistant, and then taken to the dental office. *Id.* at 12-13. Watson reports the dental specialist, Virgilio Beltran, treated his injuries and that the report of that

---

complaint entirely supersedes and takes the place of an original pleading, rendering the original complaint of no legal effect ); *Boelens v. Redman Homes, Inc.*, 759 F.2d 504, 508 (5th Cir. 1985) (same).

treatment included the following findings: Tooth #8-Avulsion; tooth #9 -bone loss, periapcial radioluency, tenderness, widened PDL; Tooth #10 - tenderness widened PDL; Lips Upper- bleeding, erythema, laceration and swelling. *Id.* at 13. He was then transported to a holding cell, and then placed in the SHU from that date in August until mid- December 2013, when he was transferred to FCI-Bennettsville. *Id.,* at 13-14. Plaintiff seeks a declaration that his constitutional rights were violated, a permanent injunction against defendants Sanders and Batts, and "compensatory damages in the amount of $75,000 for actual punitive damages against each defendant, jointly and severally." *Id.,* at 15.

Plaintiff's more definite statement includes a general statement of the overview of the events made the basis of this case, which the Court finds helpful to include here:

> In a nutshell, a fight took place that was racially motivated in Sunset Unit #2. This fight was of a serious nature because it involved inmates who were members of dangerous gangs (known as South Siders, Los Angelos, CA). This fight was interrupted prematurely, inmates in the area were body searched as well as the entire unit. Many threats were made, "this isn't over, only the beginning." "You mother----- best get plenty of body bags, you gonna need em." At this point it was clear that later on at some point in time this was going to get much worse. The Lieutenant and his two officers failed to take whatever steps necessary to prevent any additional bloodshed. It was blatantly clear because the inmates stayed suited up with their heavy boots on during the night that trouble was eminent. It was not a matter of if, but only when. The second floor unit lights were kept lit because trouble was expected, however this was not enough. An additional officer was posted but this was not enough either. Because of the past violent record in this facility, involving killings, beat downs, etc. of blacks and Mexicans. The staff should have known the same to be expected on August 7, 2013. The inmates lives were in the hands of this Lieutenant and two officers, but no steps were taken to divide the opposing gangs into smaller groups rendering them ineffective and less dangerous. It was simply a pressure cooker waiting to explode. The Lieutenant and his officers had subjective awareness of a substantial risk about to happen. There can be no excuse that they did not know, they simply disregarded the signs and didn't care.

More Definite Statement (MDS) (doc. 23, at 3.)

## II. PRELIMINARY SCREENING

Plaintiff is an inmate who has been permitted to proceed *in forma pauperis*. As a prisoner seeking redress from an officer or employee of a governmental entity, his complaint is subject to preliminary screening pursuant to 28 U.S.C. § 1915A. *See Martin v. Scott*, 156 F.3d 578, 579-80 (5th Cir. 1998) (per curiam). Because he is proceeding *in forma pauperis*, his complaint is also subject to screening under § 1915(e)(2). Both § 1915(e)(2)(B) and § 1915A(b) provide for *sua sponte* dismissal of the complaint, or any portion thereof, if the Court finds it is frivolous or malicious, if it fails to state a claim upon which relief may be granted, or if it seeks monetary relief against a defendant who is immune from such relief.

A complaint is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." *Id.* at 327. A claim lacks an arguable basis in fact when it describes "fantastic or delusional scenarios." *Id.* at 327-28. A complaint fails to state a claim upon which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To avoid dismissal for failure to state a claim, plaintiffs must allege facts sufficient to "raise the right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Mere "labels and conclusions" nor "a formulaic recitation of the elements of a cause of action" suffice to state a claim upon which relief may be granted. *Id.*

## III. ANALYSIS

### (A)   Failure to State a Claim Upon Which Relief May be Granted

Plaintiff seeks recovery in this case for violation of his constitutional rights under *Bivens* v.

*Six Unknown Named Agents of the Federal Bureau of Narcotics ("Bivens")*, 403 U.S. 388 (1971). In the *Bivens* case, the Supreme Court recognized an individual's right to seek recovery for violation of constitutional rights by a person acting under color of federal law. 403 U.S. at 297. *Bivens* is the counterpart to 42 U.S.C. § 1983, and extends the protections afforded under § 1983 to parties injured by federal actors. *See Evans v. Ball*, 168 F.3d 856, 863 n. 10(5th Cir. 1999) ("A *Bivens* action is analogous to an action under § 1983--the only difference being that § 1983 applies to constitutional violations by state, rather than federal officials"),*overruled on other grounds*, *Castellano v. Fragozo*, 352 F.3d 939, 948-49 & n. 36 (5th Cir. 2003).

In order to assert a claim for damages for violation of federal constitutional rights under *Bivens,* a plaintiff must set forth facts in support of both of its elements: (1) the deprivation of a right secured by the Constitution or laws of the United States (2) by a person acting under color of law. *See West v. Atkins*, 487 U.S. 42, 48 (1988)(elements of § 1983 action); *Evans*, 168 F.3d at 863 n. 10. The bulk of the this analysis focuses on whether Plaintiff has sufficiently pleaded facts that show a violation of his constitutional rights against the listed defendants, and then also turns to the general viability of particular constitutional and statutory based claims.

(I) Eighth Amendment Claims--No Facts of Deliberate Indifference

Under the Eighth Amendment, an inmate is required to allege facts that indicate officials were deliberately indifferent to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In order to establish deliberate indifference through a failure-to-protect claim, an inmate must show first that he was incarcerated under conditions posing a substantial risk of serious harm and then that prison officials were deliberately indifferent to his need for protection. *Jones v. Thaler*, 69 F. App'x. 658, 2003 WL 21356014, at *1 (5th Cir. 2003) (citing *Neals v. Norwood*, 59 F.3d 530, 533 (5th Cir.

1995)). A threat that one inmate will physically assault another poses a substantial risk of serous harm. *Jones,* 2003 WL 21356014, at *1 (citing *Horton v. Cockrell,* 70 F.3d 397, 401 (5th Cir. 1995)). But Watson never asserts, either in his amended complaint or in his more definite statement, that he personally was targeted by any other defendant or group of defendants, and he does not allege that he relayed any threat of harm to any defendant in this case. Thus, Watson fails to state a clear particularized threat.

Furthermore, "[n]ot every injury suffered by a prisoner at the hands of another rises to the level of a constitutional violation . . . ." *Horton,* 70 F.3d at 400. In order to satisfy the second prong, that the official was deliberately indifferent to his need for protection, Watson must allege facts that show each defendant was deliberately indifferent to the risk that he could be assaulted. "Deliberate indifference is established by showing that the defendant officials (1) were aware of facts from which an inference of excessive risk to the prisoner's health or safety could be drawn and (2) that they actually drew an inference that such potential for harm existed." *Herman v. Holiday,* 238 F.3d 660, 664 (5th Cir.2001) (internal quotation marks omitted). Generally, a finding of deliberate indifference "must rest on facts clearly evincing 'wanton' actions on the parts of the defendants." *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985).

Although Watson has written extensively in both his amended complaint and in his answers to the Court's questions in his more definite statement, he never actually recites facts to show deliberate indifference to the risk of harm to him that arose before the prison disturbance. First, in the amended complaint, Watson writes generally of the defendants' negligence. Amend Compl. (Doc. 5, at 2-3.) Allegations of negligence are not sufficient to maintain an action for violation of constitutional rights. *See, e.g., Daniels v. Williams,* 474 U.S. 327, 332 (1986) (concluding that the

6

constitution "is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property"); *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986) (stating that "lack of due care . . . simply does not approach the sort of abusive government conduct" which rises to the level of a constitutional violation); *Thompson v. Upshur County, Tex.,* 245 F.3d 447, 459 (5th Cir. 2001) ("Deliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of harm.")

More particularly, in the amended complaint, Watson grouped his theories of recovery and labeled them Claim A, Claim B, Claim C, and Claim D. But when the Court restated the break down of these claims in the order for more definite statement, and repeatedly asked Plaintiff to "state any facts that show that any particular defendant acted wantonly or with deliberate indifference to *your* health and safety," with regard to any of these sub-claims, Plaintiff never recited any facts that any defendant took action or failed to take action that caused or anticipated any harm to Plaintiff himself. *See* MDS, at 3-7. And, furthermore, when the Court gave Plaintiff an opportunity to state facts against each specific defendants, although Plaintiff wrote out conclusions and broad general statements, he did not recite facts to state wanton actions or deliberate indifference. Listed here are the particular allegations Watson provided in response to this Court's inquiry about each defendant listed as a Captain, Lieutenant, or Officer:

*- Lieutenant Miller*

> It is clear that Lt. Miller has specific duties and obligations under 18 USC 4042(a) General(2)(3), and for protecting the inmates under his charge. He allowed various inmate groups to group up, clearly against BOP Policy, PS 3740.01, 179(d)(1), 511.1 Prohibited Activities. Based on the gravity of the events and all the warnings and signals showing that trouble of a serious nature was eminent, Lt. Miller simply ignored it all. In this case the Plaintiff's life was actually in Lt. Miller's hands. His survival and life depended on this lieutenant and other officers previously discussed. Lt. Miller's conduct meets the deliberate indifference and wanton standards. (Doc.

23, at 5.)

Lieutenant Miller failed to follow BOP Policy and to intervene in the situation within the scope of his job assignment. He was the front line supervisor, he knew the racial tension that was at hand, he knew trouble was eminent because SIS Lieutenant Anderson had been receiving phone calls throughout the night to that affect. Lieutenant Anderson would have called him about this.

Plaintiff had the right and reasonable expectation to be protected from the attack which Lieutenant Miller foresaw. He was warned by phone and he saw the conduct demonstrated by the inmate population, especially when they remained suited up, with boots on ready for battle. Lieutenant Miller is a sworn officer and agent of the United States of America, Inc. He is bound by all laws that exist whether they be federal, state, local or administrative. Plaintiff was totally dependant on this man for his survival. Plaintiff is protected under the U.S. Constitution and the law of nature. He had the right to life, which Miller ignored. (Doc. 23, at 14.)

*- Lieutenants Miller and Anderson*
Lieutenant Miller and SIS Lieutenant Anderson were present on the rec yard the morning of August 7, 2013. Lieutenant Miller, the senior officer and shift lieutenant on the over-night watch was the same individual who had responsibility for ordering the recall August 7th, AM. Miller knew things were going to explode. Lieutenant Miller was present early AM in the rec yard which is highly unusual. Normally after count and the yard opens he remains elsewhere. This observation to be considered circumstantial but in light of the riot taking place it is indicative that he sensed **serious** trouble. NOTE: In furtherance, Lieutenant Anderson was on the upper yard and was making the statement in general, "I've been getting calls all night about this, you got your ID's on ya?" Clearly she had prior knowledge based on her questions and conduct. (Doc. 23, at 6.)

*- Lieutenant Anderson*
SIS Lieutenant Anderson had advance knowledge that trouble was afoot. She admitted to several inmates in the yard that she had been receiving calls all night about the riot. This was pointed out in the original complaint. See Complaint, Page 11, Under Incident Section, Numbers 8, 9, and 10. By her own admission she knew beforehand that the assault was going to take place . . . Quite simply this Lieutenant failed to do her duty to protect inmates from assault. It all could have been avoided by properly employing BOP Policy already in place.

Lieutenant Anderson (SIS) had a heightened responsibility even more so than the other officers because she was SIS. It was actually her duty to see that other officers and inmates conduct was kept within BOP Policy. Her degree of responsibility in this matter is great, maybe even more so than the others because she is essentially their police force, and a lieutenant to boot. It should shock any trier of fact that she knew

ahead of time and took no steps to prevent it. Plaintiff had a reasonable expectation to be protected from the impending attack. It was extremely egregious that Lieutenant Anderson knew and did nothing. She violated plaintiff's 5th and 8th amendment rights and also her sworn duty as a government agent to observe all laws, state, federal, local, and administrative rules/regulations. (Doc. 23, at 13-14.)

*- Lieutenant Breuer*
One of Lieutenant Breuer's primary responsibilities is to quickly respond to a security issue involving inmate safety. It should be noted that it was Lt. Breuer who had the authority and responsibility in enforcing security measures at the time in question. He was the ranking officer. Once again Lt. Breuer knew of the danger, was required to address the danger, and deliberately failed to do so. He had subjective and objective knowledge of a substantial risk. He consciously disregarded this risk, clearly demonstrating his deliberate indifference. (Doc. 23 at 5.)

The Supreme Court of the United States has opined on many occasions that prison administrators are charged with ensuring the safety of inmates. *See Hudson V. Palmer*, 488 US 517. Lieutenant Breuer was charged to do this but simply did not. The logs will show facts leading up to the time of riot and it will be shown that this Lieutenant did not respond in accordance with policy or even in a reasonable manner. (Doc. 23, at 13.)

*- Unnamed Captain*
Clearly the captain was held to a degree of responsibility which is higher than his lieutenants or first line officers. And clearly when a riot takes place notifications by way of emergency communications should have made to this captain and even the warden. The riot was a life threatening situation and in this case even the Texas Rangers were called in . . . The captain knew or should have known the circumstances taking place and the on-going effects of the assaults. He should have supervised his staff to assure that proper responses were made as per policy. He failed to do this. (Doc. 23, at 12.)

*- Officer Kennedy*
Plaintiff lists the officer in this section as Kennedy but he is unsure whether this name is correct. This officer is what is called the CMS officer, works in facilities and is responsible securing facilities and equipment, See BOP Statement PS 4500.10. This officer opened the gated confines of CMS then proceeded through without re-securing the entrance. It is believed he entered another building or outbuilding in CMS. Inmates grouped up on the lower rec yard were able to see the unsecured entrance. It is because of this that they were able to get weapons (bricks) from a staging area patio. Hispanic inmates gathered their weapons and began there assault after re-entering the lower level rec yard unchecked. This officer also was aware of the impending riot because he was in the vicinity when the assailants were grouping up and did nothing to stop it. (Doc. 23, at 15.)

9

*- Unnamed Facilities Manager*

The unknown [Facilities Manager] supervisor should have ensured that his subordinates were doing their duties according to law, Policy and their respective oaths. Because based on the facts of what happened it was obvious, he did not do this, he was also in violation of policy, (Doc. 23, at 15-16.)

*- Unnamed Recreation Shack Officers*

It is through videos of these officers it can be shown that they failed to take any action when the riot began and also it will be shown that a large number of Hispanic inmates were passing through the rec shack where they were posted, much out of the ordinary. Normally maybe 50 to 60 inmates would pass through this area in an hour at early AM, but on this particular day an excess of 500 inmates passed through. Quite obviously it should have alerted the guards to take action. (Doc. 23, at 16.)

*- Additional Actions of Officers Not Listed As Defendants*

This unknown officers who participated in the upper body search, Sunset Unit: 2nd floor, [on] August 6, 2013 . . . had a sworn duty and a statutory duty to comply with all laws, and BOP Rules and Regulations. See (BOP) PS 3000.30, Knowledge required by the position. These unknown officers failed to exercise "course correction" behavior modification. BOP Policy requires such action to maintain security. This 'course correction' policy is in place to protect the plaintiff's right to be free from the infliction of cruel and unusual punishment and insure his equal protection . . . Each officer had a subjective knowledge of the substantial risk and failed to respond legally and within reason. (Doc. 23, at 6.)

None of these detailed recitations as to any of the defendants involved in the oversight and operation of the gymnasium or recreation yard, state any facts that support a finding of wanton action or deliberate indifference to the risk of particular harm to Watson prior to the prison disturbance. The recitations all essentially amount to claims that these persons were exposed to factors under which they could or even should have known of a risk that a prison racial fight/disturbance could occur that would result in physical harm to inmates, including Watson. But that is not enough. As noted, deliberate indifference, though, "must rest on facts clearly evincing 'wanton' actions on the parts of the defendants." *Johnson,* 759 F.2d at 1238. This subjective deliberate-indifference standard is equated with the standard for criminal recklessness:

[A] prison official cannot be found liable under the Eighth Amendment for denying

an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837. Plaintiff has not stated facts to meet this standard in order to state a violation of the Eighth Amendment against these defendants. Therefore, Plaintiff's claims against Lieutenant Miller, Lieutenant Anderson, Lieutenant Breuer, an unnamed Captain, Officer Kennedy, an unnamed Facilities Manager, unnamed Recreation Shack Officers, and additional unnamed Officers should be dismissed.

(II.) No Personal Involvement

Although Watson has named BOP Director Charles Samuels and Warden Batts as individual defendants, he has recited no facts to relate any personal actions of Samuels and Batts to the allegations made the basis of his complaint. In order to state a *Bivens* claim, the claimant must allege personal involvement of a defendant. *Guerrero-Aguilar v. Ruano,* 118 F. App'x 832, 833 (5th Cir.2004). Federal officials cannot be held vicariously liable for the acts of subordinates under the doctrine of respondeat superior. *Cronn v. Buffington,* 150 F.3d 538, 544 (1998) (citing *Abate v. Southern Pac. Transp. Co.,* 993 F.2d 107, 110 (5th Cir. 1993)). Without personal involvement or participation in an alleged constitutional violation, the individual should be dismissed as a defendant. *Cronn,* 150 F.3d at 544 (citing *Thompkins v. Belt,* 828 F.2d 298, 304 (5th Cir. 1987)).

Here, in response to the Court's inquiries about the naming of defendants Samuels and Batts, Plaintiff wrote the following:

*- Charles Samuels*
Charles Samuels, Jr. is the director of the Federal Bureau of Prisons and was so at the time of the incident. He has the obligation to use proper oversight ensuring all judicial policies are being carried out, and followed by those under his authority. For safe keeping of property, inmates and staff at united states prisons. Charles Samuels

11

was aware of the on-going violence at this facility but did not take appropriate reasonable action to stop it. There is no excuse because lives were at stake.

Mr. Samuels is not just a figurehead. He is charged with enforcing, policy, rules, laws etc. that affect a person's natural right to life. His failure to do so at this facility was a violation of constitutional law, state law, federal law. (Doc. 23, at 9-10.)

*- Warden Batts*
Plaintiff attempted to discuss the allegations with Warden Batts personally when he visited Plaintiff in the SHU. Warden refused to take action, saying, "it was the responsibility of others". In this Batts exhibited deliberate indifference. He was told but didn't want to know. BOP Policy refers to a warden as the CEO. Chief Executive Officer. Warden Batts has 'grand' discretion being the warden at FCI Big Springs, in exercising his duties in the daily activities of the prison and therefore functional liability attaches to this warden. One of those duties is to ensure 'all' policies, rules, and procedures are followed by those subjected to his 'grand' authority staff and inmates. Batts is legally responsible for the operation at (FCI) Big Spring low and the welfare of all inmates at the prison. Above adequate training is supposed to be provided for each staff employee under the Warden's authority and he is to see that this training is completed. Because proper emergency procedures were not followed it is reasonable to assume that the staff members involved in this incident were either not trained or not adequately supervised by Batts. Additionally over-crowding lead to a high level of violence. The over-crowding is violation of state, local and federal law. Batts regularly violated these laws. In a nutshell Batts as gate keeper in the key leadership role failed to perform proper 'over-sight' over his staff and to see that they complied with all policies and laws. (Doc. 23, at 10-11.)

A review of these allegations shows that Watson has named each of Samuels and Batts in a supervisory capacity, and seeks to hold them liable only upon a theory that they were responsible for the actions of their subordinates. Watson has not alleged any particular facts that Samuels and Batts were aware of and personally involved in the prison disturbance of August 7, 2013. Thus, Watson has not stated a viable individual liability claim under *Bivens* for violation of the Eighth Amendment, and any such claims against Samuels and Batts must be dismissed.[2]

---

[2]Allegations of inadequate processing of a grievance do not support a constitutional violation. As the Court of Appeals for the Fifth Circuit found in *Geiger v. Jowers:* "[ An inmate] does not have a federally protected liberty interest in having these grievances resolved to his satisfaction. As this claim relies on a legally nonexistent interest, any alleged due-process violation arising from the alleged failure to investigate

This analysis also extends to the recitation of claims against Associate Warden Williams for any actions or conduct he may have allegedly taken that related to the conditions at FCI-Big Spring prior to the prison disturbance. In response to the Court's inquiry about Associate Warden Williams, Plaintiff provided:

> Associate Warden Williams, another senior staff member also had legal responsibility to see that rules, policies and law was followed. But at the same time Williams had the unique responsibility for facilities operation and security. He was responsible for the weapons used in the attack, the gates being unsecured, etc. Most Disturbing of all: was that after the riot had occurred Plaintiff was laying in a semi unconscious state, immobilized in the gymnasium. Warden Williams and an unknown African American male (case manager from Sunrise Unit) accompanied Williams into the gym through an unlocked doorway. They saw Plaintiff in his condition but failed to render help, call for an ambulance, or to even make a cursory check. Plaintiff had a hole in his head and was close to death. His teeth were knocked out and there was an enormous amount of blood around him. Plaintiff thought he was going to die and called out for help to the warden. He looked at him and just walked off in another direction leaving Plaintiff to die.

> Associate Warden Williams, under 'BOP 'duty of care' guidelines failed to provide for plaintiff's protection in 'defense of third persons.', or the enforcement of BOP rules, by staff, was deliberately indifferent to the securement of prohibited areas without staff supervision. This deliberate indifference to policies left plaintiff exposed to substantial risk of harm, even death. He was critically assaulted by Hispanic inmates armed with weapons (bricks) that Williams should have had locked up. (Doc. 23, at 11-12.)

Again, like Samuels and Batts, as to the claims made herein relate only to Williams's supervisory responsibility over certain areas of the prison, he has failed to state any personal involvement of Williams in any factual events related to the conditions where the prison disturbance took place, and

---

his grievances is indisputably meritless." *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir.2005); *see also Jenkins v. Henslee*, No. 3-01-CV-1996-R, 2002 WL 432948, at *2 (N.D. Tex. March 15, 2002) ("An inmate does not have a constitutional entitlement to a grievance procedure. Hence any alleged violation of the grievance procedure does not amount to a constitutional violation")(citing *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir.1994) and *Antonelli v. Sheahan*, 81 F.3d 1422 (7th Cir.1996)). Thus, to the extent Watson's allegation that Batts failed to respond to his post-event complaints amounts to an unspecified due process claim, as that allegation does not state a due process violation, any additional claim against Warden Batts related to the processing of any claim/grievance must be dismissed.

the immediate prior actions of officers deployed in that area of the prison. Thus, as to those allegations, Watson's claims against Williams should be dismissed.

Of course, Watson also make a more particular claim that when Williams walked by him after he sustained injuries to his head and mouth during the prison disturbance, Williams observed Watson's injured and bleeding condition, but failed to take any action to assist him. (Doc. 5, at 12, doc. 23, at 11-12.) In his recitation of the underlying incident in the amended complaint, Watson listed Williams' observation of him as taking place when Watson was leaning against the wall with an ice-wrapped shirt, but before prison staff had resolved and quelled the disturbance. Amend Compl. (doc. 5, at 12.) In this regard, Watson reported that Williams observed him and then moved on into a computer room, all before subsequent events that included "inmates kicking the door until it open[ed] . . . prison staff appeared holding guns pointed at African-Americans inside the gym . . . [and] a tear-gas canister was shot into the gym." *Id.* The Supreme Court has explained that a different standard of review must be employed in the context of review of the actions of prison officials while responding to a prison riot:

> We have, indeed, found that deliberate indifference does not suffice for constitutional liability (albeit under the Eighth Amendment) even in prison circumstances when a prisoner's claim arises not from normal custody but from response to a violent disturbance. Our analysis is instructive here:
>
> > "[I]n making and carrying out decisions involving the use of force to restore order in the face of a prison disturbance, prison officials undoubtedly must take into account the very real threats the unrest presents to inmates and prison officials alike, in addition to the possible harms to inmates against whom force might be used.... In this setting, a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." *Whitley v. Albers*, 475 U.S., at 320, 106 S.Ct., at 1084.

14

We accordingly held that a much higher standard of fault than deliberate indifference has to be shown for officer liability in a prison riot. In those circumstances, liability should turn on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.,* at 320–321, 106 S.Ct., at 1085 (internal quotation marks omitted).

*County of Sacramento v. Lewis,* 533 U.S. 833, 852-53 (1998), *abrogated on other grounds, Saucier v. Katz,* 533 U.S. 194 (2001).

Based upon Watson's recitation of his injury and the events on the day of the prison disturbance, Assistant Warden Williams was, when he observed Watson's injuries, still in the midst of moving through the area of the prison where the disturbance was still ongoing. Thus, viewing Williams's alleged failure to take action to address Watson's injuries while Williams was still in the middle of taking action to quell the disturbance, his conduct cannot be said to arise to the malicious and sadistic standard set out in *Whitley.* Thus, Plaintiff's remaining claim against Williams also fails to state a claim upon which relief may be granted and should be dismissed.

(III.) No Corporate Liability

Plaintiff has also listed as a defendant in this case the Howard County Community College, which Watson alleges offers a course within the FCI-Big Spring facility. (Doc. 5, at 5.) Plaintiff alleges that Howard College has a contractual relationship with FCI-Big Spring, to provide masonry training to inmates, and in that capacity failed to secure the bricks and materials that were then used as weapons by the inmates during the disturbance. (Doc. 23, at 16.) Watson seeks to hold Howard College liable for alleged violation of his constitutional rights through *Bivens* for the acts of its unnamed employees. Just as a municipal corporation is not vicariously liable for the constitutional torts of its employees, however, a private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights. *See Rosborough v.. Mgmt. & Training Corp.,* 350 F.3d

459, 461 (5th Cir.2003) (extending municipal corporate liability in the § 1983 context to private

prison management corporations and their employees). A private corporation is liable under § 1983

only when an official policy or custom of the corporation causes or is the "moving force of the

constitutional violation." *Id.* Plaintiff's complaint is devoid of any allegations that an official policy

or custom of the Howard College was the "moving force" behind any alleged deprivation of

Plaintiff's civil rights. Accordingly, Plaintiff's claims against this entity should be dismissed.

(IV.)   Access to Court

As noted above, Plaintiff complained in this suit of being housed in SHU from mid-August

2013 until his transfer out to FCI-Bennettsville in mid-December 2013. Watson also claims that he

was denied access to court because he was unable to timely file a § 2255 motion during his SHU

housing because he was denied access to legal resources. (Doc. 23, at 8.)

Although the Supreme Court, in *Bounds v. Smith*,[3] recognized a fundamental constitutional

right of access to the courts, it later clarified the scope of a prisoner's right of access to the courts and

found that a prisoner must allege an actual injury to support a claim for a violation of such right:

> Because *Bounds* did not create an abstract, freestanding right to a law library or legal
> assistance, an inmate cannot establish relevant actual injury simply by establishing
> that his prison's law library or legal assistance program is sub-par in some theoretical
> sense . . . [t]he inmate therefore must go one step further and demonstrate that the
> alleged shortcomings in the library or legal assistance program hindered his efforts
> to pursue a legal claim.

---

[3] *See Bounds v. Smith,* 430 U.S. 817, 828 (1977) (recognizing prisoners' constitutional right of access
to courts); *see generally Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741 (1983) ("[T]he right
of access to the courts is an aspect of the First Amendment right to petition the Government for redress of
grievances"); *Johnson v. Atkins,* 999 F.2d 99, 100 (5th Cir. 1993) ("Meaningful access to the courts is a
fundamental constitutional right, grounded in the First Amendment right to petition and the Fifth and
Fourteenth Amendment due process clauses") (quoting *Chrissy F. v. Mississippi Dept. Of Public Welfare,*
925 F.2d 844, 851 (5th Cir. 1991)).

*Lewis v. Casey,* 518 U.S. 343, 351 (1996). Thus, in order to state a claim of a right to relief on the alleged facts, Watson must set forth that the complained-of action hindered his efforts to pursue a legal claim. *See Chriceol v. Phillips,* 169 F.3d 313, 317 (5th Cir. 1999) (inmate alleging denial of access to courts must demonstrate actual injury)((citing *Ruiz v. United States,* 160 F.3d 273,275 (5th Cir. 1998)(holding that without proof of actual injury a prisoner cannot prevail on an access-to-the-courts claim)).

Watson contends that he would have successfully received relief against his conviction under 28 U.S.C. § 2255, had he not been limited in his ability to file papers while in the SHU. (Doc. 23, at 8.) Watson was convicted in 2012 in the United States District Court for the Northern District of Iowa of conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 846 and 851 (Count 1), and distribution of a controlled substance at or near a school in violation of 21 U.S.C. §§ 860(a), 841(a)(1), 841(b)(1)(c) and 851 (Count 5), and sentenced to a total term of 180 months' imprisonment. *See United States v. Watson,* No.5:11-CR-04014-MWB-2 (N.D. Iowa January 13, 2012 Judgment).[4] A review of the records of that case and the civil case arising from the filing of a § 2255 motion, show that although Watson's § 2255 motion was dismissed as untimely, he had sought an extension of time and argued the timeliness of the § 2255 motion based upon the arguments raised here. *See Watson v. United States,* No. 5:14-CV-4011-MWB (N.D. Iowa) (February 13, 2014 § 2255 Motion, at 13; June 26, 2014 Memorandum Opinion and Order). The Court rejected Watson's arguments, in part, because he failed to state sufficient substantive claims for relief under § 2255. *See Watson,* No. 5:14-CV-4011-MWB (June 26, 29014 Memorandum Opinion and Order

---

[4]The court takes judicial notice of the records of Plaintiff criminal case in the United States District Court for the Northern District of Iowa. *See* Fed. R. Evid. 201(b)(2) and (c)(1).

at 4-10.) As these records show that Watson presented a motion under § 2255 to his convicting court, and that court considered and rejected the arguments regarding his inability to timely file a § 2255 motion due to his SHU housing, he cannot support a claim for denial of access to court in this proceeding. Watson's claims that he was denied the right of access to court should be dismissed.

**(B)      No Defendant Named as to Lack of Medical/Dental Care**

As noted above, Plaintiff recited that he received injuries to his mouth and three specific teeth that were initially reviewed by dentist Virgilio Beltran. (Doc. 5, at 13.) In the more definite statement, Watson noted that dentist Beltran told him that could not render treatment to Watson while he was housed in the SHU. (Doc. 23, at 8.) Watson also asserts that during the period of time that he was housed in SHU, he was denied medical treatment and dental treatment. (Doc. 23, at 8.) When asked to state any facts of which particular defendant was involved in the denial of medical and dental treatment, however, Watson replied only that "numerous individuals were involved." (Doc. 23, at 8.) But, in this case, Watson has already listed eight named defendants, four other unnamed defendants (or groups of defendants) and he recited the actions of dentist Beltran (without then naming him as a defendant). Based on the status of this case, and Watson's history of being able to name numerous other defendants or officers filling other positions, his failure to recite the name of any specific defendant or that person's actions related to any denial of medical or dental care while he was housed in SHU, should result in dismissal of any claims arising out of a lack of medical/dental treatment while in the SHU without prejudice.

**(C) No Cause of Action under 18 U.S.C. § 4042**

Plaintiff also contends that the defendants violated 18 U.S.C. § 4042. (Doc. 5, at 3.) Section 4042 provides, in part, that the duties of the BOP include the "safekeeping, care, and subsistence of

all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4202(a)(2) (West 2015). While the United States Court of Appeals for the Fifth Circuit has not yet ruled on whether this statute creates a separate cause of action, other circuits have determined that it does not create a cause of action against either the BOP or its employees. *See Harper v. Williford*, 96 F.3d 1526, 1528 (D.C. Cir.1996); *Chinchello v. Fenton*, 805 F.2d 126, 134 (3rd Cir.1986); *Williams v. United States*, 405 F.2d 951, 954 (9th Cir.1969); *see also Nwaebo v. Hawk-Sawyer*, No.03-4184, 2004 WL 950073, at *2 (6th Cir. 2004) (unpublished). These cases are persuasive. Section 4042 sets out the duties of the BOP, but it does not create a separate cause of action outside of *Bivens* or the FTCA. *See Thomas v. Jeter*, 2010 WL 2381575, *3 (N.D. Tex. June 8, 2010) (citing other circuits in holding that § 4202 does not create a separate cause of action); *cf Muhammed v. United States,* 6 F. Supp.2d 582, 594 (N.D. Tex. 1998) (holding that an inmate may bring a FTCA claim based on a claim that the BOP has breached its duty under § 4042(a)). Any claim based on an alleged violation of § 4042 is without merit and should also be dismissed.

## IV. RECOMMENDATION

For the foregoing reasons, it is **RECOMMENDED** that all Plaintiff claims, except those arising from an alleged lack of medical or dental care while housed in the SHU, should be **DISMISSED** with prejudice under 28 U.S.C. §§ 1915A(B)(1) and 1915(e)(2)(B)(ii). It is further **RECOMMENDED** that the remaining claims for an alleged lack of medical or dental care while housed in the SHU, should be **DISMISSED** without prejudice.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law.

Any party may object to this Report and Recommendation. A party who objects to any part of this Report and Recommendation must file specific written objections within fourteen (14) days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and identify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. The failure to file specific written objections will bar the aggrieved party from attacking on appeal the factual findings, legal conclusions, and recommendation set forth by the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superceded by statute on other grounds,* 28 U.S.C. § 631(b)(1) (extending the time to file objections from ten to fourteen days), *as recognized in ACS Recovery Servs., Inc. V. Griffin*, 676 F.3d 512, 521 n. 5 (5th Cir. 2012).

**SO ORDERED**.

Signed August __5__, 2017.

E. SCOTT FROST
UNITED STATES MAGISTRATE JUDGE